UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE FARM LIFE INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> RACHEL BROCKETT, JOSHUA BROCKETT, DANELLE BROCKETT, NICHOLAS BROCKETT, and KATHRYN BROCKETT <br><br> Defendants. | CIV-F-09-0356 AWI SMS <br><br> ORDER RE: RACHEL BROCKETT'S MOTION FOR SUMMARY JUDGMENT |

**I. History**

Plaintiff State Farm Life Insurance Company ("State Farm") insured the life of Matthew Scott Brockett for a number of years. Rachel Botkin and Matthew Brockett married in 2002. Joshua Brockett, Danelle Brockett, Nicholas Brockett, and Kathryn Brockett (collectively the "Brockett Children") are Matthew Brockett's children by previous marriage. On August 7, 2006, the life insurance policy ("Policy") was increased to $500,000, with Rachel Brocket to receive $380,000, and the Brockett Children to receive $30,000 each. Matthew and Rachel Brockett separated in early 2008. On March 11, 2008, Matthew Brockett filed for divorce. Doc. 39, Ex. C. On April 8, 2008, Matthew and Rachel Brockett signed a Marital Settlement Agreement ("MSA"). Doc. 31, Ex. D. The MSA included language concerning life insurance proceeds. On

1

June 24, 2008, the Fresno County Superior Court entered a judgment of dissolution incorporating the MSA and specifying that Matthew and Rachel Brockett would become single persons on September 25, 2008. Doc. 31, Ex. D.  Matthew Brockett obtained a change of beneficiary form for the Policy on July 25, 2008. Doc. 31, Ex. M.  He filled the form out, naming the Brockett Children as the primary beneficiaries, sharing the $500,000 equally. Doc. 31, Ex. L.  Matthew Brockett signed and dated the form on August 30, 2008, with a witness signing and dating the form on August 31, 2008.  That change of beneficiary form was never mailed.  Matthew Brockett died on September 15, 2008.

Rachel Brockett claims $380,000 of the Policy proceeds.  The Brockett Children claim all $500,000 of it.  On February 26, 2009, State Farm filed suit against Rachel Brockett and the Brockett Children on an interpleader theory in the Eastern District of California.   State Farm deposited the entire life insurance payment of $512,217.70 ($500,000 plus interest) with the Clerk of the Court.  The parties were unable to come to an agreement to move the case to state court.  On April 16, 2010, State Farm was dismissed from this case and awarded $9,439.70 in attorney's fees and costs. Doc. 55.

Rachel Brockett and the Brockett Children are proceeding in this case without a complaint.  The parties have filed answers to State Farm's complaint, but have not directly framed the dispute between them in a pleading.  The minutes of a scheduling conference held on July 27, 2009 state, "Legal issue remaining is whether Defendant Brockett (nee Botkin), ex-wife and mother of remaining Defendants, has any legal claim to insurance proceeds." Doc. 20. Rachel Brockett has moved for summary judgment, asking that "this Court grant her summary judgment directing that her share of the benefits of the subject Policy be paid to her." Doc. 28, Memo, at 10:3-5. The Brockett Children oppose the motion.  The matter was taken under submission without oral argument.

## II. Legal Standards

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Juell v. Forest Pharms., Inc., 456 F.Supp.2d 1141, 1149 (E.D. Cal. 2006); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated ...by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003).  If the non-moving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1103 (9th Cir. 2000).

### III. Statements of Facts

**A. Rachel Brockett's Statement of Undisputed Facts**[1]

1. In 1987 the deceased Matthew Scott Brockett, purchased a life insurance policy from State

---

[1] Rachel Brockett's facts are contained in Doc. 29.  The Brockett Children's disputes are contained in Doc. 38.

**4**

Farm with initial basic death benefits of $100,000 (hereafter "the Policy").

2. He named his then-wife, Glynna Brockett, as the primary beneficiary and his two children as successor beneficiaries.

3. The Policy provided that the deceased could make changes to the beneficiary designation by "sending [the insurer] a request."

4. In October 1989, the deceased made such a change by submitting documents to name his parents as the primary beneficiaries and a friend the sole successor beneficiary.

5. Subsequently, in October 1993, the deceased made another beneficiary change, this time naming his new wife, Donna Brockett, as the primary beneficiary and his parents as the successor beneficiaries.

6. Eight years later, in October 2001, the deceased submitted documents to State Farm increasing the Policy's death benefits to $250,000.00 and, concurrently, changing the beneficiary designation to name his fiancee, Rachel Brockett (then "Rachel Botkin"), and his four children, co-defendants herein, as equal primary beneficiaries; no successor beneficiary was designated.

7. In July 2002, the deceased change the beneficiary designation to reflect his marriage to his fiancee and her married name, Rachel Brockett.

8. In December 2002, the deceased submitted documents to State Farm increasing the Policy death benefits to $400,000.00 and, concurrently, modifying the Policy to provide that Rachel Brockett receive five-eighths (5/8ths) of the Policy benefits and that his children share equally in the remaining benefits.

9. About four (4) years later, in August 2006, the deceased submitted documents to State Farm increasing the Policy death benefits to $500,000.00 and changing the Policy to provide that Rachel Brockett was to receive $380,000.00 and his four children were each to receive $30,000.00.

10. On April 8, 2008, the deceased and Rachel Brockett entered into a Marital Settlement Agreement ("MSA") in connection with their divorce proceeding.

11. The MSA, which was incorporated into the Dissolution Judgment entered on June 24, 2008, provides in pertinent part: This waiver includes the right to receive assets in or proceeds from any type of life insurance, annuity, retirement plan or financial account with a death beneficiary provision, unless otherwise contained in this Agreement; or, unless the party seeking benefits is retained as a beneficiary of record on such policy, plan or account following the execution of this Agreement.
    Disputed.

12. Notwithstanding the Dissolution Judgment, the deceased and Rachel Brockett continued to maintain a close relationship and communicated regularly with each other.
    Disputed.

13. In connection with efforts to reconcile with Rachel Brockett, the deceased sought and obtained Rachel Brockett's agreement to participate in counseling.
    Disputed.

14. The deceased unexpectedly dies on September 15th, ten days before his marital status with Rachel Brockett ended.
    Disputed.

15. Prior to his death, the deceased never told any of his children that he intended to remove Rachel Brockett as a named beneficiary.

16. In addition, the deceased never submitted anything to State Farm requesting beneficiary change.

17. At the time of the deceased's death, Rachel Brockett was a named beneficiary under the Policy entitled to receive $380,000.00.
    Disputed.

18. Following the deceased's death, his former wife, Donna Brockett, and one of his children, Kathryn Brockett, discovered a change of beneficiary form apparently signed by the deceased on August 30, 2008, in the middle console of his work truck.

19. The form appears to contain the signature of a witness dated August 31st.

20. There was nothing found with the form, such as an addressed envelope, indicating that the deceased was intending to submit the form to State Farm at the time of his death.
    Disputed.

21. A facsimile transmission form from State Farm to the deceased indicates that the deceased received the change of beneficiary form on or around June 25, 2008.

22. State Farm never received anything from the deceased prior to his death indicating his desire to remove Rachel Brockett as a named beneficiary or to change the amount of benefits payable to her.

23. Up until the time of his death on September 15th, the deceased had retained Rachel Brockett

7

as a named beneficiary under the Policy.

Disputed.

**B. Brockett Children's Statement of Disputed Facts**[2]

1. Matthew Brockett filed a Petition for Dissolution of Marriage With Rachel Brockett on March 11, 2008.

2. The Marital Settlement Agreement dated April 8, 2008, provides that it shall be effective on the date of its execution.

3. Matthew Brockett was heartbroken when Rachel Brockett wanted separation from their marriage.

4. After Matthew Brockett signed the marriage dissolution papers in March 2008, he had a new girlfriend.

5. Rachel and Matthew Brockett went to counseling once or twice, and neither of them really took the time to do the counseling thing.

6. On or about the time that Rachel Brockett and Matthew Brockett signed the marriage dissolution papers in March 2008, Matthew Brockett had a new girlfriend.

7. Rachel Brockett was moving on with her life.

8. Rachel Brockett was aware of the State Farm Life Insurance from the beginning of her marriage with Matthew Brockett in 2002.

---

[2] The Brocket Children's facts are contained in Doc. 37.

9. At the time the petition for dissolution of marriage was filed in March 2008, Matthew was finished with Rachel and was moving on with his life.

10. On August 30, 2008, Matthew Scott Brockett executed and obtained the required execution of a witness to the Change of Beneficiary From for the State Farm Life Insurance removing Rachel Brockett as Beneficiary and making his four children the exclusive primary Beneficiaries. Matthew Scott Brockett believed that he had to wait until the dissolution of marriage was final to submit the Change of Beneficiary because of the standard restraining orders which are in effect upon filing a petition for dissolution of marriage.

11. In the time period shortly before his death, Matthew Brockett was busy caring for his terminally ill father and campaigning for re-election for his seat on the Reedley City council.

12. There is no way that Matthew Brockett intended to leave any financial benefit to Rachel Brockett beyond what she received in the MSA; he would have wanted everything to go to his kids.

## IV. Discussion

Rachel Brockett argues that she has a claim to the Policy's proceeds under California law as she was a named beneficiary under the Policy.  She subsidiarily argues that the MSA specifically allows each divorcing spouse to retain the other as a life insurance beneficiary.  The Brockett Children argue that the language of the MSA automatically removed Rachel Brockett as a beneficiary of the Policy.  "Under California law, we look to the language of the property settlement agreement to determine whether the agreement extinguishes the expectancy interests of life insurance beneficiaries." Life Ins. Co. of N. Am. v. Ortiz, 535 F.3d 990, 993 (9th Cir. 2008), citing Life Ins. Co. of N. Am. v. Cassidy, 35 Cal. 3d 599, 605 (Cal. 1984); see also Grimm v. Grimm, 26 Cal. 2d 173, 175 (Cal. 1945).  Notwithstanding the fact that Rachel Brockett is a named beneficiary of the Policy in State Farm's records, the MSA determines

9

whether Rachel Brockett can receive proceeds.

**A. Rules of Construction**

"Under California law, the interpretation of a written contract is a matter of law for the court even though questions of fact are involved." Southland Corp. v. Emerald Oil Co., 789 F.2d 1441, 1443 (9th Cir. 1986). "Marital settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretations of contracts generally. Any ambiguity in the language of such an agreement must be construed in favor of the right to spousal support. A term of the agreement is ambiguous if it is susceptible of more than one reasonable interpretation. Provided it supports a meaning to which the language is reasonably susceptible, extrinsic evidence is admissible to prove the parties' intent as to ambiguous terms in a marital settlement agreement. As a matter of substantive law, extrinsic evidence cannot be relied on to support a meaning to which the agreement is not reasonably susceptible. When the language of the judgment incorporating the marital settlement agreement is clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express language. Extrinsic evidence of the parties' intentions is inadmissible to vary, alter, or add to the terms of an unambiguous agreement." In re Marriage of Iberti, 55 Cal. App. 4th 1434, 1439-40 (Cal. App. 2d Dist. 1997), citations omitted. "Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning. Interpretation of a contract is a matter of law, including whether the contract is ambiguous." United States v. King Features Entertainment, Inc., 843 F.2d 394, 398 (9th Cir. 1988), citations omitted.

California recognizes two forms of ambiguity: patent and latent. Patent ambiguity appears on the face of the text itself while latent ambiguity arises from extrinsic evidence that casts doubt on the plain meaning of the text. See Supervalu, Inc. v. Wexford Underwriting Managers, Inc., 175 Cal. App. 4th 64, 73-74 (Cal. App. 2d Dist. 2009). "California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous." Foad Consulting Group v. Musil Govan Azzalino, 270 F.3d 821, 826 (9th Cir. 2001). "[E]ven if the written agreement of

the parties is clear and unambiguous on its face, the trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible. However, if after considering extrinsic evidence the court finds the language of the contract is not reasonably susceptible to the asserted interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract." United States v. King Features Entertainment, Inc., 843 F.2d 394, 398 (9th Cir. 1988), citations omitted.  "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., 69 Cal. 2d 33, 37 (Cal. 1968). "[T]he meaning of language is to be found in its applications. An indeterminacy in the application of language signals its vagueness or ambiguity. An ambiguity arises when language is reasonably susceptible of more than one application to material facts. There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application. Accordingly, even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." Dore v. Arnold Worldwide, Inc., 39 Cal. 4th 384, 391 (Cal. 2006), citations omitted.  For latent ambiguity to exist, the text must be reasonably susceptible to an interpretation (supported by extrinsic evidence) that is at odds with the plain meaning of the text.

**B. Patent Ambiguity**

      The relevant part of the MSA discusses benefits arising from the death of one of the parties in three sentences:

      11. WAIVER OF RIGHTS (DEATH) Each party hereby waives the right to receive any

> property or rights whatsoever or at all on the death of the other, *unless such right is created or affirmed by the other under a Last Will and Testament or other written document executed after the effective date of this Agreement*. The rights that are waived include but are not limited to any property passing by intestate succession, any property passing under testamentary disposition, inter vivos trusts and dispositions, probate homesteads, setting aside an estate, the right to take against a decedent's will, the statutory share of an omitted spouse, and the right to be appointed as an executor, administrator or other personal representative of a decedent. This waiver includes the right to receive assets in or proceeds from any type of life insurance, annuity, retirement plan or financial account with a death beneficiary provision, unless otherwise contained in this Agreement; or, *unless the party seeking benefits is retained as a beneficiary of record on such policy, plan or account following the execution of this Agreement*.

Doc. 31, Ex. D, MSA, at 5-6 (81-82 of 121), emphasis added.  This language expresses the general intent for each party to waive rights to benefits associated with the death of the other; that is undisputed.  The parties disagree as to the scope of the exception(s) to that general waiver. With regard to this language, Rachel Brockett generally asserts that the MSA "expressly allowed him to retain his wife, Rachel Brockett, as a named beneficiary, and his failure to request a beneficiary change can only be construed as his election to retain her on the Policy," Doc. 28, Memo, at 7:5-7.  The Brockett Children assert "that the MSA resulted in an immediate waiver of Matthew's and Rachel's right to receive any money or property upon the death of the other, including but not limited to insurance proceeds, unless one of them executed a written document on or after April 8, 2008, the date the MSA was signed." Doc. 36, Opposition, at 9:23-27.  The Brockett Children provide a detailed discussion of how the first and third sentences interact:

> The *entirety* of ¶ 11 of the MSA makes clear that Rachel's waiver of the right to receive Matthew's property at his death, including insurance proceeds, is immediate and self-executing. The *only* exception to the waiver in ¶ 11 of the MSA occurs where the right is created or affirmed by a written document executed *after* the date of the MSA.
>
> ....
>
> The first sentence of ¶ 11 illuminates two points critical to its proper interpretation: (1) that Matthew and Rachel *waived* their 'right to receive any property or rights whatsoever at all on the death of the other,' and (2) that the waiver was effective immediately *unless* the right to inherit was created by one spouse in favor of the other by a '*Last Will and Testament or other written document executed after the effective date of this Agreement*.' (Emphasis supplied). The second and third sentences explain the scope of the waiver, and its exception, contained in the first sentence. Both the second and third sentences begin with language discussing the nature of the rights which the parties had waived in ¶ 11, including but not limited to insurance proceeds....The final phrase of the third sentence - 'or unless the party seeking benefits is retained as a beneficiary of record on such policy, plan or account following the execution of this Agreement' - is not an isolated, stand alone provision of the MSA as Rachel misleadingly contends. It is instead part of a

> comprehensive paragraph setting forth, and then explaining, the scope of the waiver Matthew and Rachel agreed to by signing the MSA.

Doc. 36, Opposition, at 5:9-13 and 11:7-13, emphasis in original. Rachel Brockett focuses on the "retained as a beneficiary of record" language of the third sentence while the Brockett Children rely on the "created or affirmed by...written document" language of the first sentence.

On the surface, there is some tension between the first and third sentences as the term "created or affirmed by the other under a...written document" is not congruent with "retained as a beneficiary of record." A careful reading of the text shows that the two sentences do not actually conflict as they refer to separate exceptions to the waiver. The first sentence sets the terms for a general exception to the waiver of death related rights (new written document required) and the third sentence creates a specific exception for the waiver of life insurance proceeds (passive retention as beneficiary).

The Brockett Children's argument that the specific exception is a restatement of the general exception is incorrect. "Retain" is significantly different than "create or affirm" in a new written document. The word "retain" is defined as "1a: to keep in possession or use. b. to keep in one's pay or service. c. to keep in mind or memory. 2. To hold secure or intact." Merriam-Webster Online Dictionary at http://www.merriam-webster.com/dictionary/retain. There is no implication of new affirmative conduct, only passive continuation. The exception to the waiver in the third sentence can not be construed as a restatement of the exception in the first sentence as the terms are not equivalent. To accept the Brockett Children's interpretation would be to render the "retained as a beneficiary of record" language a nullity. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code §1641.

This conclusion is buttressed by the language of the second sentence which is simply a nonexclusive list of rights waived. The second sentence gives definition to the types of rights that are included in the waiver and general exception created in the first sentence. It does not create any separate type of exception. In contrast, the third sentence discusses one specific benefit (life insurance proceeds) and creates an exception to the waiver distinct from the

13

exception of the first sentence.  The terms "life insurance, annuity, retirement plan or financial account with a death beneficiary provision" were not appended on to the list in the second sentence, but were set apart in their own sentence and given their own special exception.

Based on the plain language of the MSA, there is no patent ambiguity.

**C. Latent Ambiguity**

While the language of the MSA is unambiguous and supports Rachel Brockett's interpretation, the language is reasonably susceptible to the Brockett Children's interpretation. To be clear, the issue is not whether Matthew Brockett wanted or intended to keep Rachel Brockett a beneficiary after the divorce but rather whether Matthew Brockett thought the terms of the MSA automatically removed her as a beneficiary.  Whether relations between Matthew and Rachel Brockett were harmonious or acrimonious is not directly relevant to determine if there is latent ambiguity.  Both parties agree that the MSA allowed Matthew Brockett to retain Rachel Brockett as a beneficiary if he so chose; they dispute the mechanism specified by the MSA to accomplish that end.  The language is not reasonably susceptible to an interpretation that the MSA absolutely waived all death benefits without exception.  The only thing that matters is Matthew Brockett's and Rachel Brockett's understanding of what the MSA meant.  The parties have not framed the issue in terms of divorce or family law so the court looks solely at the law of contract interpretation.  Extrinsic evidence is considered to determine if there is the possibility of latent ambiguity within these bounds.

The Brockett Children argue that the following extrinsic evidence supports their interpretation of the MSA: "(1) that during the time period in which the MSA was negotiated and signed, Matthew had moved on with his life, (2) that he had a new girlfriend, (3) that he was finished with Rachel and that he did not want to have any more to do with her, (4) that he had contacted State Farm to request a change of beneficiary designation form, (5) that he had signed the change of beneficiary form *removing* Rachel as a beneficiary and designating the Brockett children as sole beneficiaries of the State Farm policy on August 30, 2008, (6) that his signature was witnessed by a co-worker on August 31, 2008, (7) that he did not send the change of

14

beneficiary form to State Farm because he thought the standard Family Law restraining orders prevented him from changing the beneficiaries until September 25, 2008, ten days [after] he died, and (8) that he did not want to financially benefit Rachel." Doc. 36, Opposition, at 9:14-22, emphasis in original.  Much of the evidence provided by the Brockett Children demonstrate the fact that Matthew and Rachel Brockett were getting a divorce and does not speak to the meaning of the MSA.  It is undisputed that Matthew and Rachel Brockett waived their rights to benefits arising from the other's passing.  It is also undisputed that the waiver contained exceptions such that Matthew Brockett could grant/restore such rights to Rachel Brockett and vice versa; any contention to the contrary would not be an interpretation the plain text of the MSA is susceptible to.  The little relevant extrinsic evidence that exists actually supports Rachel Brockett's interpretation of the MSA, not the Brockett Childrens' interpretation.

The Brockett Children point out that Matthew Brocket filled out a form removing Rachel Brockett as a beneficiary after signing the MSA.  This fact demonstrates that Matthew Brockett wished to remove her as a beneficiary but also supports the conclusion that he did not believe the terms of the MSA did so.  That is, Matthew Brockett did not believe the MSA automatically extinguished Rachel Brockett's claims as beneficiary and was preparing to take active steps to remove her so as to not "retain" her as a beneficiary.  This interpretation is supported by the declarations of Matthew Brockett's friends. "Based upon my conversations with Matthew, there is no way that he intended to leave her as a beneficiary on his insurance policy. Shortly before he died, he said he was filing papers to remove her from the insurance policies because the divorce was getting close." Doc. 42, Bonner Declaration, at 2.  "Based upon my conversations with Matthew, there is no way that he intended to leave her as a beneficiary on his insurance policy. He said that he was filing papers to remove her from the insurance policies." Doc. 41, Loving Declaration, at 2:4-6.  These statements provided by the Brockett Children are consistent with Matthew Brockett believing that Rachel Brockett remained a beneficiary under the Policy until he filed a change of beneficiary form; there is no indication that he thought the terms of the MSA

15

removed her.[3]

The Brockett Children admit that they did not discuss the Policy with Matthew Brockett. "Q. Within the six month preceding your father's death, did you have any discussion with him regarding his retirement plan or any of the life insurance policies? A. No." Doc. 39, Ex. H, Danelle Brockett Declaration, at 6:19-23 (53 of 55). "Q. Prior to your father's death, had you had any discussion with him about any of the life insurance policies or the retirement plan? A. No." Doc. 31, Ex. F, Joshua Brockett Declaration, at 9:15-18 (96 of 121). "Q. Prior to his death, did you have any discussions with your father about his changing the beneficiary under either the life insurance polices or his retirement plan? A. No. That was never discussed." Doc. 31, Ex. H, Nicholas Brockett Declaration, at 17:4-8 (102 of 121). "Q. -did you have any discussions with your father about either the retirement plan or any of the life insurance policies? A. No." Doc. 31, Ex. I, Kathryn Brockett Declaration, at 8:3-6 (106 of 121). In contrast, Rachel Brockett states, "Prior to signing the Marital Settlement Agreement there were discussions about the fact that my husband and I were free to remove the other as a beneficiary on our respective life insurance policies or retain the other as a beneficiary. I recall having discussions with my husband and the paralegal who helped us prepare the Agreement in which we specifically discussed the waiver provision and the fact that my husband and I could each elect to retain the other as a beneficiary on our respective life insurance policies and retirement accounts. In fact, I recall the paralegal specifically telling my husband that he would have to submit a document to his life insurance companies in order to remove me as a beneficiary on his policies." Doc. 30, Rachel Brockett

---

[3] The Brockett Children also provide a statement concerning a conversation between their counsel and the Matthew Brockett's girlfriend at the time of his death: "According to Lydia, Matthew Brockett wanted to move on from Rachel. He further mentioned that he had life insurance but that he thought he could not remove Rachel as beneficiary until his divorce became final which was to occur on September 25, 1008." Doc. 39, Wagner Declaration, at 2:20-22. The statement by Lydia Zabricki strongly supports the conclusion that Matthew Brockett did not think the MSA removed Rachel Brockett as a beneficiary. Rachel Brockett has objected to this evidence as inadmissable hearsay. Doc. 46, Objections, at 2:17-20. While Lydia Zabricki's statement concerning Matthew Brockett's state of mind is not being used to show the truth of the matter, the counsel's recounting of Lydia Zabricki's statement is hearsay. Thus, the court does not rely on this evidence in deciding the motion.

Declaration, at 2:3-10.

Rachel Brockett also claims that the MSA was drafted by Matthew Brockett: "All I did was sign them. Scott prepared them, he worked with the paralegal." Doc. 39, Ex. F, Nov. 9, 2009 Deposition, at 31:22-23 (42 of 55). "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code §1654. "Where the parties question the interpretation of critical language in an instrument, the language will generally be held to be ambiguous and where ambiguity or uncertainty in the terms of a written instrument cannot otherwise be reconciled, the agreement must be construed most strictly against the party whose agent prepared the instrument or the ambiguous portion thereof." In re Marriage of Williams, 29 Cal. App. 3d 368, 378 (Cal. App. 4th Dist. 1972), citations omitted.

The extrinsic evidence does not support the Brockett Children's interpretation of the MSA. There is no latent ambiguity. The MSA did not automatically remove Rachel Brockett as a beneficiary under the Policy but rather stated that Matthew Brockett could retain her by not changing the beneficiary designation of the Policy.

**D. Change of Beneficiary**

Rachel Brockett was a named beneficiary under the Policy in State Farm's records at the time Matthew Brockett passed away. Matthew Brockett had requested and received a change of beneficiary form on July 25, 2008. He filled the form out to remove Rachel Brockett as a beneficiary, but he had not sent it in to State Farm before he died. The form was signed on August 30, 2008, and signed by a witness on August 31, 2008. These facts do not seem to be disputed. The initial Policy Matthew Brock signed in 1987 states, "You may make a change while the Insured is alive by sending us a request. The change will take effect the date the request is signed, but the change will not affect any action we have taken before we receive the request. We have the right to request your policy to make the change on it." Doc. 31, Ex. C, Policy, at 7 (40 of 121). "Request" is defined as "A written request signed by the person making the request. Such request must be sent to and be in a form acceptable to us." Doc. 31, Ex. C, Policy, at 5 (38

17

of 121).

"As a general rule, California requires a change to a beneficiary designation to be made in accordance with the terms of the policy. If it is not, no change is accomplished, unless whatever occurred in that respect comes within one of more of the three exceptions to the rule. The three exceptions are (1) when the insurer waives strict compliance with its own rules regarding the change; (2) when it is beyond the insured's power to comply literally with the insurer's requirement; or (3) when the insured has done all that he could to effect the change but dies before the change is actually made." Life Ins. Co. of N. Am. v. Ortiz, 535 F.3d 990, 994 (9th Cir. Cal. 2008), citing Cook v. Cook, 17 Cal. 2d 639, 648-49 (Cal. 1941).  Matthew Brockett never sent in the change of beneficiary form and so did not send in a "request" in accordance with the terms of the Policy.  The Brockett Children do not argue that Matthew Brockett completed State Farm's process to remove Rachel Brockett, nor do they argue that the first or second exceptions apply.  The Brockett Children do raise the third exception: "a policy owner may revoke a beneficiary designation form [sic] without fully complying with the insurance company's rules if he or she has demonstrated a clear intent to make the change and done the best he could have under the circumstances to implement that change." Doc. 36, Opposition, at 15:5-8.

"Where the insured makes every reasonable effort under the circumstances, complying as far as he is able with the rules, and there is a clear manifestation of intent to make the change, which the insured has put into execution as best he can, equity should regard the change as effected." Pimentel v. Conselho Supremo de Uniao Portugueza do Estado, 6 Cal. 2d 182, 188 (Cal. 1936).  Policy holders who give completed change of beneficiary forms to third parties to mail on their deathbeds are considered to have met that standard. See Pimentel v. Conselho Supremo de Uniao Portugueza do Estado, 6 Cal. 2d 182, 189 (Cal. 1936); Johnston v. Kearns, 107 Cal. App. 557, 559 (Cal. App. 4th Dist. 1930).  The Ninth Circuit found that the "every reasonable effort" standard was not met when "during February 1966 Mr. Barnes executed a change of beneficiary request card and that on one occasion during the next twenty-two months he instructed an employee to change the beneficiary of the policy. There is no evidence that Mr. Barnes was incapacitated in any way during these twenty-two months; all the evidence shows

18

that he continued to conduct his business. Under these circumstances, he could certainly have done more to insure that the contractual requirements were complied with." Manhattan Life Ins. Co. v. Barnes, 462 F.2d 629, 633 (9th Cir. 1972). Given the passage of time between the policy holder's directions to have the beneficiary changed and his death, there was no excuse for not confirming that the change was accomplished. Similarly, sending an unsigned form to the insurer fails to meet the standard. BankAmerica Pension Plan v. McMath, 206 F.3d 821, 831 (9th Cir. 2000).

One court found that a policy holder had substantially complied with the procedures for changing beneficiaries in circumstances that bear some resemblance to the case at hand: "The provisions in Nancy's insurance policies relating to change of beneficiary are obviously ambiguous, but they appear to confer upon the policyholder the broad right to change beneficiary by notice in writing given to the company"; she wrote to the insurer stating that she wished to remove her son as beneficiary in favor of her daughter because she knew his father had provided for him financially and requested a change of beneficiary form; requested a second form when the first was inadvertently destroyed; executed a new will in which she left her son only one dollar; and died one month later without returning the change of beneficiary form. Saunders v. Stevers, 221 Cal. App. 2d 539, 540-41 (Cal. App. 1st Dist. 1963). In discussing Saunders, the Ninth Circuit concluded, "The court's ruling appears to be based on the fact that the insured's first letter to the insurance company fulfilled the requirement that she give written notice to the insurer. Her failure to complete the beneficiary designation forms was not fatal." BankAmerica Pension Plan v. McMath, 206 F.3d 821, 831 (9th Cir. 2000). The policy holder had informed the insurer exactly how she wanted to change her policy in the initial letter requesting a form. That change was consistent with how the policy holder was settling her affairs as she contemporaneously executed a new will that also left her son nothing. In the case at hand, critically, there is no evidence that suggests Matthew Brockett communicated the nature of his beneficiary change (remove Rachel Brockett in favor of Brockett Children) to State Farm before he passed away.

Matthew Brockett completed the beneficiary change form but did not mail it to State

Farm. Unlike the deceased in <u>Pimentel</u> and <u>Johnston</u>, Matthew Brockett did not arrange to have the form sent in by a third party either. Before he died, he had not informed State Farm in writing that he wished to remove Rachel Brockett and increase the Brockett Children's shares as beneficiaries. The MSA conspicuously permitted both parties to retain the other as a beneficiary. The court specifically notes that the Brockett Children have presented persuasive evidence that Matthew Brockett may very well have intended to change the beneficiary provisions in their favor. Nevertheless, the court is bound by existing California law which mandates the conclusion that Matthew Brockett's actions did not succeed in removing Rachel Brockett as a beneficiary.

### V. Order

Rachel Brockett's motion for summary judgement is GRANTED.

Rachel Brockett is entitled to her share of the benefits from Matthew Brockett's life insurance policy ($380,000 plus interest minus $9,439.70).

The Brockett Children are entitled to the remainder of the proceeds which were never in dispute ($30,000 each plus interest).

Rachel Brockett is directed to submit a proposed order dealing with the disbursement of the funds held by the Clerk's Office.

IT IS SO ORDERED.

Dated:     August 25, 2010

_____
CHIEF UNITED STATES DISTRICT JUDGE